UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BRUCESTAN T. JORDAN,          :
                             :    Civil Action No. 08-6088 (AET)
          Plaintiff,         :
                             :
     v.                      :    OPINION RECEIVED
                             :
EDMOND C. CICCHI, et al.,     :    MAR - 9 2010
                             :
          Defendants.        :    AT 8:30 _____ M
                                  WILLIAM T. WALSH
                                       CLERK

**APPEARANCES:**

Plaintiff, pro se              Counsel for Defendants
Brucestan T. Jordan            Edmond C. Cicchi
F.C.I. Miami                   County of Middlesex
P.O. Box 7798000               Middlesex County
Miami, FL 33177                Middlesex Co. Adult Corr. Ctr.

                               Lori A. Dvorak
                               Danielle Abouzeid
                               Dvorak & Associates, LLC
                               390 George Street
                               8th Floor
                               New Brunswick, NJ 08901


**THOMPSON**, District Judge

     By Opinion and Order [14, 15] entered June 18, 2009,
familiarity with which is presumed, this Court dismissed all
claims asserted in Plaintiff's Complaint and Amended Complaint
and granted him leave to move to re-open to file a second amended
complaint, attaching to any such motion a proposed second amended
complaint addressing the deficiencies of the Amended Complaint as
described in the Opinion.

     This matter is again before the Court pursuant to
Plaintiff's submission of a Motion [17] to re-open and to file a

second amended complaint and certain defendants' Cross Motion

[23] pursuant to the All Writs Act, 28 U.S.C. § 1651.[1]

## I.    FACTUAL ALLEGATIONS

Plaintiff seeks to file a second amended complaint based

upon the following allegations:

> 19.   On July 25th, 2008 after filing the proper
> paperwork, the undersigned received a visit that was
> noticed and advertised as a contact visit.  The
> visiting parties were Bruce Jordan (father), Lizzie
> Jor4dan (mother), and Shirronda Jordan (sister).  Once
> the undersigned got to the visiting room, he and the
> visiting parties was notified by the correctional staff
> that their was no contact allowed during the visit.
>
> 20.   This undisclosed private county, policy is a
> direct contradiction to the Department of Corrections
> (DOC) 10A:18-6.16(d) policy, which states: Handshaking,
> embracing, and kissing shall be permitted, within
> appropriate bounds, at the beginning and end of the
> visit... .  The correctional staff stated that if their
> was any contact during the course of the visit, the
> visit will be terminated and all party's will be asked
> to leave.  Which turned the visit that was advertised
> as a contact visit, into a non-contact visit.  The
> 10A:18-6.16(d) policy was changed and/or enforced by
> EDMOND C. CICCHI, who turned contact visits into non-
> contact visits.
>
> 21.   These key details of their con-contact during a
> contact visit policy was an act of fraudulent
> concealment and deceptive nondisclosure.  Their's
> nothing in their Correction Center Inmate Guidelines
> handbook that states theirs no contact allowed during a
> contact visit.  The undisclosed policy wasn't published
> on their Inmate Contact Visit Request Form under the
> Visiting Rules section.  Therefore a visiting party and
> the inmate have no way of knowing that there is no

---

[1] In addition, Plaintiff has filed several Motions [24, 29, 34, 37] to strike the defendants' submissions.  These motions will be summarily denied; this Court will consider the submissions made by all parties.

contact allowe3d during the visit until he/she gets to the visiting room.

22.  At the visiting table the undersigned and his family members were under constant surveillance from the video cameras and were being watch by the guards at all times during the course of the visit.  At the visiting table their was a barrier/blockade in fron of the undersigned and his family members, to prevent and negate contact between him and his family members. Their was no contact between the undersigned and his visiting parties.

23.  The surveilance from the video cameras, the barrier/blockade, and the constant visual surveilance from the guards made it impossible for the undersigned and his family to engage in contact without it being detected by the correctional staff.

24.  After the visit was over, Correctional Officer Clint P. Giles ordered the undersigned to take off his clothes.  This demand violated their 10A:3-5.7(b)1 "Strip Searches" policy, which states 'strip searches' are done: 1.  After a contact visit ... .  The undersigned refused the order because the correctional officers didn't have probable cause to search the undersigned.  Contact during the visit is what gives an officer probable cause to do a strip search.  Since their was no contact during the visit, the officer didn't have probable cause to strip search the undersigned.

25.  When the undersigned refused to be strip searched, Officer GILES called 1 UNKNOWN SGT and the UNKNOWN SGT ordered that 1 of the 2 UNKNOWN correctional officers (badge #101) to take the undersigned to an undisclosed location for a strip search.  Upon entering the location that didn't have any cameras or other witnesses.  The correctional officer (badge #101) started to remove the undersigned clothes in a ruff sexual like manner.  Once the undersigned was stripped naked, the officers started giving the undersigned orders to perform different homosexual acts.  One of the officers told the undersigned to put his butt out so he can get a better look at it.  When the undersigned refused, the officer kicked and injuried my knees sending me to the floor on my newly injuried knee.  While the undersigned was on the floor, another

3

officer vigorously stomped on the undersigned's upper
back with his left foot.  While the undersigned was on
the floor naked and battered, the officers was staring
at him in a sexual way and started making homosexual
comments.  One of the comments was "ok now I want to
hear you cough."

...

27.  After the assault, the guards stole the
undersigned sneakers (Nikes Size 13), tht the
undersigned paid over $60.00 (sixty u.s.d.) for, just a
month or two before the sexual assault.

28.  After the sexual assault, correctional officer
Clint P. Giles trumped up a bogus Refusal to Submit to
a Search charge to send the undersigned to lockup.  But
the STATE OF NEW JERSEY through the COUNTY OF MIDDLESEX
and EDMOND C. CICCHI failed to report this Disciplinary
Report/Action to the FBOP as required as a condition of
the IAD.  The undersigned was in lockup for over 7
days, which was enough time for his wounds to heal.
The undersigned didn't receive medical treatment for
his injuries to his back and shoulder.

(Proposed Second Amended Complaint at ¶ 19-28.)

Plaintiff characterizes these events as giving rise to a

host of statutory and constitutional violations, which will be

addressed individually, below.  He seeks compensatory and

punitive damages and injunctive relief requiring certain

procedures to be followed during visits.  As Plaintiff is no

longer confined at Middlesex County Adult Correctional Center,

where the alleged wrongdoing occurred, his claims for injunctive

relief have become moot.  See Weaver v. Wilcox, 650 F.2d 22, 27

n.13 (3d Cir. 1981).

II.   STANDARDS FOR A SUA SPONTE SCREENING

4

This Court must dismiss, at the earliest practicable time, certain in forma pauperis and prisoner actions that are frivolous, malicious, fail to state a claim, or seek monetary relief from a defendant who is immune from such relief. See 28 U.S.C. § 1915(e)(2) (in forma pauperis actions); 28 U.S.C. § 1915A (actions in which prisoner seeks redress from a governmental defendant); 42 U.S.C. § 1997e (prisoner actions brought with respect to prison conditions). Plaintiff's proposed second amended complaint must be screened pursuant to these statutes. If a proposed amended complaint will not survive a motion to dismiss, filing will be futile and will be denied.

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. Haines v. Kerner, 404 U.S. 519, 520-21 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

In addition, any complaint must comply with the pleading requirements of the Federal Rules of Civil Procedure.

Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must plead facts sufficient at least to

5

"suggest" a basis for liability.  <u>Spruill v. Gillis</u>, 372 F.3d

218, 236 n.12 (3d Cir. 2004).  "Specific facts are not necessary;

the statement need only 'give the defendant fair notice of what

the ... claim is and the grounds upon which it rests.'" <u>Erickson</u>

<u>v. Pardus</u>, 127 S.Ct. 2197, 2200 (2007) (citations omitted).

> While a complaint ... does not need detailed factual
> allegations, a plaintiff's obligation to provide the
> "grounds" of his "entitle[ment] to relief" requires
> more than labels and conclusions, and a formulaic
> recitation of the elements of a cause of action will
> not do, <u>see</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286, 106
> S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to
> dismiss, courts "are not bound to accept as true a
> legal conclusion couched as a factual allegation").
> Factual allegations must be enough to raise a right to
> relief above the speculative level ... .

<u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1964-65 (2007)

(citations omitted).

The Supreme Court has demonstrated the application of these

general standards to a Sherman Act conspiracy claim.

> In applying these general standards to a § 1
> [conspiracy] claim, we hold that stating such a claim
> requires a complaint with enough factual matter (taken
> as true) to suggest that an agreement was made.  Asking
> for plausible grounds to infer an agreement does not
> impose a probability requirement at the pleading stage;
> it simply calls for enough fact to raise a reasonable
> expectation that discovery will reveal evidence of
> illegal agreement.  And, of course, a well-pleaded
> complaint may proceed even if it strikes a savvy judge
> that actual proof of those facts is improbable, and
> "that a recovery is very remote and unlikely." ...  It
> makes sense to say, therefore, that an allegation of
> parallel conduct and a bare assertion of conspiracy
> will not suffice.  Without more, parallel conduct does
> not suggest conspiracy, and a conclusory allegation of
> agreement at some unidentified point does not supply

facts adequate to show illegality.  Hence, when
allegations of parallel conduct are set out in order to
make a § 1 claim, they must be placed in a context that
raises a suggestion of a preceding agreement, not
merely parallel conduct that could just as well be
independent action.

    The need at the pleading stage for allegations
plausibly suggesting (not merely consistent with)
agreement reflects the threshold requirement of Rule
8(a)(2) that the "plain statement" possess enough heft
to "sho[w]" that the pleader is entitled to relief."  A
statement of parallel conduct, even conduct consciously
undertaken, needs some setting suggesting the agreement
necessary to make out a § 1 claim; without that further
circumstance pointing toward a meeting of the minds, an
account of a defendant's commercial efforts stays in
neutral territory. ...

Twombly, 127 S.Ct. at 1965-66 (citations and footnotes omitted).

    The Court of Appeals for the Third Circuit has held, in the

context of a § 1983 civil rights action, that the Twombly

pleading standard applies outside the § 1 antitrust context in

which it was decided.  See Phillips v. County of Allegheny, 515

F.3d 224, 234 (3d Cir. 2008) ("we decline at this point to read

Twombly so narrowly as to limit its holding on plausibility to

the antitrust context").

    Context matters in notice pleading.  Fair notice under
    Rule 8(a)(2) depends on the type of case -- some
    complaints will require at least some factual
    allegations to make out a "showing that the pleader is
    entitled to relief, in order to give the defendant fair
    notice of what the ... claim is and the grounds upon
    which it rests."  Indeed, taking Twombly and the
    Court's contemporaneous opinion in Erickson v. Pardus,
    127 S.Ct. 2197 (2007), together, we understand the
    Court to instruct that a situation may arise where, at
    some point, the factual detail in a complaint is so
    undeveloped that it does not provide a defendant the
    type of notice of claim which is contemplated by

> Rule 8.  Put another way, in light of <u>Twombly</u>, Rule
> 8(a)(2) requires a "showing" rather than a blanket
> assertion of an entitlement to relief.  We caution that
> without some factual allegation in the complaint, a
> claimant cannot satisfy the requirement that he or she
> provide not only "fair notice," but also the "grounds"
> on which the claim rests.

<u>Phillips</u>, 515 F.3d at 232 (citations omitted).

More recently, the Supreme Court has emphasized that, when assessing the sufficiency of <u>any</u> civil complaint, a court must distinguish factual contentions -- which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted -- and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Although the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  <u>Id.</u> at 1950.  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  <u>Id.</u>

> Therefore, after <u>Iqbal</u>, when presented with a
> motion to dismiss for failure to state a claim,
> district courts should conduct a two-part analysis.
> First, the factual and legal elements of a claim should
> be separated.  The District Court must accept all of
> the complaint's well-pleaded facts as true, but may
> disregard any legal conclusions.  Second, a District
> Court must then determine whether the facts alleged in
> the complaint are sufficient to show that the plaintiff
> has a "plausible claim for relief."  In other words, a
> complaint must do more than allege the plaintiff's
> entitlement to relief.  A complaint has to "show" such

8

an entitlement with its facts.  See Phillips, 515 F.3d
at 234-35.  As the Supreme Court instructed in Iqbal,
"[w]here the well-pleaded facts do not permit the court
to infer more than the mere possibility of misconduct,
the complaint has alleged-but it has not
'show[n]'-'that the pleader is entitled to relief.'"
This "plausibility" determination will be "a
context-specific task that requires the reviewing court
to draw on its judicial experience and common sense."

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009)

(citations omitted).

   Rule 18(a) controls the joinder of claims.  In general, "[a]

party asserting a claim ... may join as independent or

alternative claims, as many claims as it has against an opposing

party."

   Rule 20(a)(2) controls the permissive joinder of defendants

in pro se prisoner actions as well as other civil actions.

Persons ... may be joined in one action as defendants
if:
   (A) any right to relief is asserted against them
jointly, severally, or in the alternative with respect
to or arising out of the same transaction, occurrence,
or series of transactions or occurrences; and
   (B) any question of law or fact common to all
defendants will arise in the action.

(emphasis added).  See, e.g., Pruden v. SCI Camp Hill, 252

Fed.Appx. 436 (3d Cir. 2007); George v. Smith, 507 F.3d 605 (7th

Cir. 2007).

   In actions involving multiple claims and multiple

defendants, Rule 20 operates independently of Rule 18.

Despite the broad language of rule 18(a),
plaintiff may join multiple defendants in a single
action only if plaintiff asserts at least one claim to

> relief against each of them that arises out of the same
> transaction or occurrence and presents questions of law
> or fact common to all.  If the requirements for joinder
> of parties have been satisfied, however, Rule 18 may be
> invoked independently to permit plaintiff to join as
> many other claims as plaintiff has against the multiple
> defendants or any combination of them, even though the
> additional claims do not involve common questions of
> law or fact and arise from unrelated transactions.

7 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane,

Federal Practice and Procedure, § 1655 (3d ed. 2009).[2]

Where a complaint can be remedied by an amendment, a

district court may not dismiss the complaint with prejudice, but

must permit the amendment.  Denton v. Hernandez, 504 U.S. 25, 34

(1992); Grayson v. Mayview State Hospital, 293 F.3d 103, 108 (3d

Cir. 2002) (dismissal pursuant to 28 U.S.C. § 1915(e)(2)); Shane

v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000) (dismissal

pursuant to 42 U.S.C. § 1997e(c)(1)); Urrutia v. Harrisburg

County Police Dept., 91 F.3d 451, 453 (3d Cir. 1996).  Leave to

amend must be granted "in the absence of undue delay, bad faith,

dilatory motive, unfair prejudice, or futility of amendment."

Grayson v. Mayview State Hospital, 293 F.3d 103, 108 (3d Cir.

2002) (citations omitted).

### III.   ANALYSIS

A.   Claims Previously Dismissed

---

[2] The multiplicity of claims and defendants presented here
are not appropriate for joinder.  Because the proposed second
amended complaint otherwise fails to state a claim, however, this
Court need not specifically address the joinder of claims and
parties.

The proposed second amended complaint fails to cure the deficiencies noted by this Court, previously, with respect to the Complaint and Amended Complaint.  Accordingly, with respect to such claims, the request to re-open and re-assert these claims will be denied.  This Court will address separately the proposed new claims against new defendants.

B.    Fourth Amendment Claim

Plaintiff asserts that the search described in the proposed second amended complaint violated his rights under the Fourth Amendment to be free from unreasonable searches.

The Fourth Amendment to the federal Constitution, made applicable to the States by the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643 (1961), provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.  "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." U.S. v. Jacobsen, 466 U.S. 109, 113 (1984) (footnote and citations omitted).

The Supreme Court has evaluated the constitutionality of visual body cavity strip searches at federal correctional

11

facilities following "contact" visits with persons from outside the institution.

> Inmates at all Bureau of Prisons facilities, including the MCC, are required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution. [fn39] Corrections officials testified that visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution. ...
>
> > [fn39] If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. ...
>
> Admittedly, this practice instinctively gives us the most pause.  However, assuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility, we nonetheless conclude that these searches do not violate that Amendment.  The Fourth Amendment prohibits only unreasonable searches, and under the circumstances, we do not believe that these searches are unreasonable.
>
> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is constructed.  A detention facility is a unique place fraught with serious security dangers.  Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.  And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, ... and in other cases.  That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates

> to secrete and import such items when the opportunity
> arises.
>
>         We do not underestimate the degree to which these
> searches may invade the personal privacy of inmates.
> Nor do we doubt, as the District Court notes, that on
> occasion a security guard may conduct the search in an
> abusive fashion.   Such an abuse cannot be condoned.
> The searches must be conducted in a reasonable manner.

Bell v. Wolfish, 441 U.S. 520, 558-560 (1979) (footnote and

citations omitted).   Thus, individualized probable cause is not a

requirement for a reasonable search of prisoners following visits

with persons outside the prison.

Despite Plaintiff's self-serving characterization of the

visit as a "non-contact" visit, it is clear from Plaintiff's

factual allegations that the visit was something of a hybrid.

Plaintiff alleges that he and his visitors anticipated a

"contact" visit, and that they sat together at a table, albeit a

table with some sort of barrier.   Although Plaintiff alleges that

one or more guards were present during the visit, the visit took

place in a regular visiting room, presumable used by other

prisoners and their visitors.   Under these circumstances, a

visual body cavity strip search following the visit was not

unreasonable.

As for the manner in which the search was conducted,

Plaintiff admits that he twice refused to comply with lawful

orders to remove his clothes and to spread his buttocks for

visual inspection.   Again, contrary to Plaintiff's self-serving

characterization, the facts alleged do not suggest any sexual
assault or excessive force.  Instead, Plaintiff's clothes were
removed when he refused to remove them, and he was made to make
his body parts available for visual inspection, a reasonable part
of which was a demand to "cough."  Plaintiff's own allegations
reflect that a reasonable amount of force was used to compel
cooperation following Plaintiff's refusals to cooperate.
Moreover, the fact that the search took place in another room was
appropriate to the invasion of privacy inherent in a body cavity
strip search.  The search was not conducted in an
unconstitutional manner.  Cf. Brown v. Blaine, 185 Fed.Appx. 166,
2006 WL 1716772 (3d Cir. 2006) (collecting cases); Cann v.
Hayman, No. 08-3032,2009 WL 3115752 (3d Cir. Aug 20, 2009)
(upholding an instruction to "squat and cough" during a strip
search); Miska v. Middle River Regional Jail, 2009 WL 1916726
(W.D. Va. 2009) (upholding visual strip search in room near
visitation area, despite the fact that prisoner was escorted to
and from the visits, which were non-contact); Bono v. Saxbe, 527
F.Supp. 1182 (S.D. Ill. 1980) (upholding visual strip search
following non-contact visits in controlled visiting booths, in
which the inmate is separated by a plexiglass partition from his
visitor and the inmate and visitor speak through a telephone).

    Plaintiff's reliance on various provisions of the New Jersey
Administrative Code is unavailing.  Those provisions govern

searches at New Jersey state facilities, not the county facility
in which he was confined.  In addition, those provisions function
as a guide to staff, and do not provide any particular liberty
interests to prisoners.  Finally, the constitutional dimensions
of correctional strip searches are a function of the Fourth
Amendment, under which the search was constitutional.

Plaintiff has failed to state a claim for violation of the
Fourth Amendment.

C.    Eighth/Fourteenth Amendment Claims

Plaintiff asserts that he was subjected to cruel and unusual
punishment by the allegedly unlawful strip search and by the
allegedly false disciplinary report, which sent him to lockup for
seven days.

The Eighth Amendment prohibits punishments that are "cruel
and unusual."  An Eighth Amendment claim includes both an
objective component, whether the deprivation of a basic human
need is sufficiently serious, and a subjective component, whether
the officials acted with a sufficiently culpable state of mind.
Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The objective
component is contextual and responsive to "'contemporary
standards of decency.'"  Hudson v. McMillian, 503 U.S. 1, 8
(1992).  The subjective component follows from the principle that
"'only the unnecessary and wanton infliction of pain implicates
the Eighth Amendment.'"  See Farmer v. Brennan, 511 U.S. 825, 834

15

(1994) (quoting Wilson, 501 U.S. at 297 (internal quotation
marks, emphasis, and citations omitted)); Rhodes v. Chapman, 452
U.S. 337, 345 (1981).  What is necessary to establish an
unnecessary and wanton infliction of pain varies also according
to the nature of the alleged constitutional violation.  Hudson v.
McMillian, 503 U.S. at 5.

Where the claim is one of excessive use of force, the core
inquiry as to the subjective component is that set out in Whitley
v. Albers, 475 U.S. 312, 320-21 (1986)(citation omitted):
"'whether force was applied in a good faith effort to maintain or
restore discipline or maliciously and sadistically for the very
purpose of causing harm.'"  Quoted in Hudson, 503 U.S. at 6.
"When prison officials maliciously and sadistically use force to
cause harm, contemporary standards of decency always are
violated."  Id. at 9.  In such cases, a prisoner may prevail on
an Eighth Amendment claim even in the absence of a serious
injury, the objective component, so long as there is some pain or
injury and something more than de minimis force is used.  Id. at
9-10 (finding that blows which caused bruises, swelling, loosened
teeth, and a cracked dental plate were not de minimis for Eighth
Amendment purposes).

To determine whether force was used in "good faith" or
"maliciously and sadistically," courts have identified several
factors, including:

(1) "the need of the application of force"; (2) "the
relationship between the need and the amount of force
that was used"; (3) "the extent of injury inflicted";
(4) "the extent of the threat to the safety of staff
and inmates, as reasonably perceived by responsible
officials on the basis of the facts known to them"; and
(5) "any efforts made to temper the severity of a
forceful response."

Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting

Whitley v. Albers, 475 U.S. at 321).  Thus, not all use of force

is "excessive," the level of a constitutional violation.

In addition, "a corrections officer's failure to intervene

in a beating can be the basis of liability for an Eighth

Amendment violation under § 1983 if the corrections officer had a

reasonable opportunity to intervene and simply refused to do so.

Furthermore, ... a corrections officer can not escape liability

by relying upon his inferior or non-supervisory rank vis-a-vis

the other officers."  Smith v. Mensinger, 293 F.3d 641, 640 (3d

Cir. 2002).

Here, the allegations of unlawful strip search must be

analyzed under the Fourth Amendment, the explicit constitutional

textual source of the prohibition against unreasonable searches.

See Doe v. Groody, 361 F.3d 232, 238 (3d Cir. 2004).

Accordingly, these events do not state a claim under the Eighth

Amendment.  In any event, this Court has already found that the

force used was reasonable under the circumstances, including

Plaintiff's repeated refusal to submit to search.

17

In addition, the claim of a false disciplinary report and resulting confinement in lockup for seven days fails to state a claim under the Eighth Amendment.  In the first instance, Plaintiff has failed to allege any facts suggesting that the conditions in the lockup cells amounts to cruel and unusual punishment.[3]  Instead, such a claim is more properly analyzed under the Due Process Clause of the Fourteenth Amendment.

A liberty interest protected by the Due Process Clause may arise from either of two sources:  the Due Process Clause itself or State law.  See Hewitt v. Helms, 459 U.S. 460, 466 (1983); Asquith v. Department of Corrections, 186 F.3d 407, 409 (3d Cir. 1999).

With respect to convicted and sentenced prisoners, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and

---

[3] A plaintiff may satisfy the objective component of a conditions-of-confinement claim if he can show that the conditions alleged, either alone or in combination, deprive him of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, sanitation, medical care, and personal safety.  Rhodes, 452 U.S. at 347-48; Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992).  However, while the Eighth Amendment directs that convicted prisoners not be subjected to cruel and unusual punishment, "the Constitution does not mandate comfortable prisons."  Rhodes, 452 U.S. at 349.  To the extent that certain conditions are only "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their offenses against society.  Id. at 347.  Plaintiff's allegations here fail to demonstrate that confinement in lockup for seven days deprived him "the minimal civilized measure of life's necessities."

is not otherwise violative of the Constitution, the Due Process
Clause does not in itself subject an inmate's treatment by prison
authorities to judicial oversight." Montanye v. Haymes, 427 U.S.
236, 242 (1976), quoted in Hewitt, 459 U.S. at 468 and Sandin v.
Conner, 515 U.S. 472, 480 (1995). Cf. Washington v. Harper, 494
U.S. 210, 221-22 (1990)(prisoner has liberty interest under the
Due Process Clause in freedom from involuntary administration of
psychotropic drugs); Vitek v. Jones, 445 U.S. 480, 493-94
(1980)(prisoner has liberty interest under the Due Process Clause
in freedom from involuntary transfer to state mental hospital
coupled with mandatory treatment for mental illness, a punishment
carrying "stigmatizing consequences" and "qualitatively
different" from punishment characteristically suffered by one
convicted of a crime).

   "Discipline by prison officials in response to a wide range
of misconduct falls within the expected parameters of the
sentence imposed by a court of law." Sandin, 515 U.S. at 485
(upholding prisoner's sentence of 30 days' disciplinary
segregation following a hearing at which he was not permitted to
produce witnesses). See also Asquith, 186 F.3d at 410-11 (no
liberty interest under the Due Process Clause in remaining in
halfway house).

   States, however, may confer on prisoners liberty interests
that are protected by the Due Process Clause. "But these

interests will be generally limited to freedom from restraint
which, while not exceeding the sentence in such an unexpected
manner as to give rise to protection by the Due Process Clause of
its own force, nonetheless imposes atypical and significant
hardship on the inmate in relation to the ordinary incidents of
prison life." Sandin, 515 U.S. at 484 (finding that disciplinary
segregation conditions which effectively mirrored those of
administrative segregation and protective custody were not
"atypical and significant hardships" in which a state conceivably
might create liberty interest). See also Asquith, 186 F.3d at
411-12 (return to prison from halfway house did not impose
"atypical and significant hardship" on prisoner and, thus, did
not deprive him of protected liberty interest). In Griffin v.
Vaughn, 112 F.3d 703, 708-09 (3d Cir. 1997), the Court of Appeals
for the Third Circuit held that a 15-month confinement in
administrative custody did not impose "atypical and significant
hardship," even in the face of state regulation requiring release
to the general population after 20 days in the absence of a
misconduct charge.  The Court of Appeals did note, however, that
if an inmate is committed to undesirable conditions for an
atypical period of time in violation of state law, that is a
factor to be considered in determining whether the prisoner has
been subjected to "atypical and significant hardship" triggering
due process protection.  Id.

20

Here, Plaintiff has failed to allege any facts suggesting that the conditions in lockup, for seven days, amounted to "atypical and significant hardship."  Accordingly, Plaintiff has failed to state a claim for a constitutional violation based upon his confinement in lockup for seven days.

In addition, the facts as alleged in the proposed second amended complaint belie the characterization of the disciplinary report as "false."  Plaintiff admits that he refused lawful orders to strip and submit his body to a cavity search.

Finally, Plaintiff alleges that he was denied equal protection of the law after he was strip searched.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982); Artway v. Attorney General of New Jersey, 81 F.3d 1235, 1267 (3d Cir. 1996).  Here, Plaintiff alleges no facts whatsoever that would give rise to a claim of equal protection violation.

Plaintiff has failed to state a claim for a constitutional violation based upon these facts.

D.   New Federal Statutory Claims

Plaintiff asserts that the facts alleged amount to actionable violations of the Interstate Agreement on Detainers Act; the False Claims Act, 31 U.S.C. § 3729-3720; the Sherman Anti-Trust Act, 15 U.S.C. § 1; 28 U.S.C. § 1605(a)(6); the White Slave Traffic Act; 42 U.S.C. § 1983, 1985, and 1986;[4] and the Civil RICO Act, 18 U.S.C. § 1964.

1.   Interstate Agreement on Detainers Act

The Interstate Agreement on Detainers ("IAD") is a congressionally-sanctioned interstate compact among 48 states (including both New Jersey and Connecticut), the District of Columbia, Puerto Rico, the Virgin Islands, and the United States. See 18 U.S.C. App.II § 2; N.J.S.A. 2A:159A-1 to -15; Conn. Gen. Stat. § 54-186; New York v. Hill, 528 U.S. 110 (2000); Cuyler v. Adams, 449 U.S. 433, 442 (1981); U.S. v. Paredes-Batista, 140 F.3d 367, 372 n.9 (2d Cir.), cert. denied, 525 U.S. 859 (1998). The IAD aims "to encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried

---

[4] Plaintiff's claims under §§ 1985 and 1986 were dismissed in this Court's previous Opinion and Order. Plaintiff makes no new allegations here to cure the deficiencies noted previously. Accordingly, the proposed second amended complaint fails to state a claim under either of these sections. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3 (1979)).

indictments, informations or complaints" by providing cooperative procedures among the party jurisdictions.  IAD, Art. I.

Plaintiff has failed to allege facts suggesting any violation of the Interstate Agreement on Detainers; in any event, because the IAD provides for administrative remedies in case of a violation, e.g., 18 U.S.C. Appendix III, Article 3(d) and Article 4(e), no private right of action is implied under the statute. Van Riper v. U.S. Marshall for Eastern Dist. of Tennessee, 815 F.2d 81 (Table), 1987 WL 36286, 1 (6th Cir Feb. 2, 1987).

2.   False Claims Act, 31 U.S.C. § 3729-3720

The False Claims Act provides for liability for certain fraudulent acts committed against the federal government.

(a) Liability for certain acts.--

(1) In general.--Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without

completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; [Public Law 101-410]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a).  Plaintiff has alleged no facts that would

suggest liability by any of the named defendants under the False

Claims Act.  Moreover, a non-attorney pro se plaintiff is barred

from bringing such a qui tam action on behalf of the United

States.  See, e.g., U.S. ex re. Mergent Services v. Flaherty, 540

F.3d 89 (2d Cir. 2008).

3.   <u>Sherman Anti-Trust Act, 15 U.S.C. § 1</u>

Section 1 of the Sherman Act proscribes "[e]very contract, combination ... or conspiracy [ ] in restraint of trade or commerce...."  15 U.S.C. § 1.  In order to state a claim for a violation of Section 1, a plaintiff must allege "(1) the existence of a conspiracy (2) affecting interstate commerce (3) that imposes an 'unreasonable' restraint of trade."  <u>Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 961 F.2d 1148, 1158 (5th Cir. 1992) (citing <u>White & White v. Am. Hosp. Supply Corp.</u>, 723 F.2d 495, 504 (6th Cir. 1983)), <u>cert. denied</u>, 506 U.S. 1079 (1993).

Plaintiff fails to allege any facts that would suggest a basis for a private claim under the Sherman Anti-Trust Act.

4.   <u>28 U.S.C. § 1605(a)(6)</u>

Title 28 U.S.C. Section 1605 provides for general exceptions to the jurisdictional immunity of a foreign state and has no application to the facts alleged in the proposed second amended complaint.

5.   <u>White Slave Traffic Act</u>

The White Slave Traffic Act, 18 U.S.C.  2421, prohibits the interstate transportation of any individual "with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense."  This statute, and the related sexual abuse statutes at 18 U.S.C.

25

§§ 2241, 2242, 2244, are criminal statutes and do not give rise to any private right of action.  In addition, Plaintiff has failed to allege facts that would suggest any violation of these statutes.

    6.  <u>Civil RICO Act, 18 U.S.C. § 1964</u>

The Civil RICO Act provides a remedy to "[a]ny peson injured in his business or property by reason of a violation of section 1962 of this chapter."  18 U.S.C. § 1964(c).  Section 1962 provides, in pertinent part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

> To make out a claim for relief "a civil RICO claimant must prove (1) a violation of the substantive RICO statute, 18 U.S.C. § 1962, and (2) an injury to the plaintiff's 'business or property by reason of a violation of section 1962.'"  Thus, in addition to the element of injury, a civil RICO plaintiff making a claim under subsection (c) must prove:
>
> (1) the existence of an enterprise which affects interstate or foreign commerce;
> (2) that the defendant was "employed by" or "associated with" the enterprise;
> (3) that the defendant participated in the conduct of the enterprise's affairs; and
> (4) that the participation was through a pattern of racketeering activity....

<u>Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local
Union 639</u>, 913 F.2d 948, 950 (D.C. Cir. 1990), <u>cert. denied</u>, 501
U.S. 1222 (1991).

Plaintiff has utterly failed to allege any facts that would
support a civil RICO claim.

E.    <u>The Defendants' Cross-Motion for Injunctive Relief</u>

During the course of this litigation, Plaintiff has filed
numerous meritless materials with various government agencies,
including false and fraudulent UCC-1 Financing Statements, false
notices of "default" and claims of "liens" against defendants, as
evidenced by attachments to defendants' Cross Motion for relief
pursuant to the All Writs Act.

Defendants Edmond C. Cicchi, Middlesex County Adult
Correction Center, and the County of Middlesex have moved this
Court, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), for an
injunction, "on behalf of themselves and their agents, servants,
employees, counsel and their employees, elected and appointed
officials, in both their individual and official capacities,
including but not limited to their counsel (Lori A. Dvorak, Esq.,
Warren Hare, Esq., and Danielle Abouzeid, Esq. of the law firm
Dvorak & Associates, LLC) and/or their insurance carriers
(Inservco Insurance Services Incorporated, Pennsylvania National
Mutual Casualty Insurance Company, Westport Insurance

Corporation) and/or their insurance claims representatives (Casey Grouser and Stephen Daveggia).

Specifically, these Defendants seek an injunction:

1) nullifying, voiding, striking and expunging from public record any and all UCC-1 Financing Statements, "Default Judgments," "Notices of Default," "Notices of Aceptance," "Notice of Fault and Opportunity to Cure and Contest Acceptance," "Liens," "Involuntary Bankruptcy," "Bills/Invoices" and/or demands for payment of monies due and owing and/or similar documents filed by plaintiff, Brucestan Jordan, against defendants and/or their agents, servants, employees, counsel and their employees, elected and appointed officials; and

2) enjoining plaintiff, Brucestan Jordan, from continuing to harass defendants by filing any further similar UCC-1 Financing Statements, "Default Judgments," "Notices of Default," "Notices of Acceptance," "Notice of Fault and Opportunity to Cure and Contest Acceptance," "Liens," "Involuntary Bankruptcy," "Bills/Invoices" and/or demands for payment of monies due and owing and/or similar filings against defendants and/or their agents, servants, employees, counsel and their employees, elected and appointed officials, without prior permission of the Court; and

3) enjoining plaintiff, Brucestan Jordan, from filing any future claims in this district against defendants and/or their agents, servants, employees, counsel and their employees, elected and appointed officials, without prior permission of the Court.

(Motion for Injunctive Relief, at 12-13.)

Pursuant to the All Writs Act, 28 U.S.C. § 1651, federal courts have power to issue injunctions restricting the filing of pleadings, without leave of court, by litigants with a history of

filing meritless and vexatious litigation.  See In re Oliver, 682
F.2d 443 (3d Cir. 1982).  "However, such injunctions are extreme
remedies and should be narrowly tailored and sparingly used."  In
re Packer Avenue Associates, 884 F.2d 745 (3d Cir. 1989).

As vexing as Plaintiff's various filings may have been to
the defendants here and their counsel, they do not, at this time,
rise to the level that would compel this Court to issue an
injunction of the broad type requested by Defendants.  This Court
is aware of the serious nature of such allegedly false financial
filings, see generally Monroe v. Beard, 536 F.3d 198 (3d Cir.
2008; Lundy v. Hollingsworth, Civil No. 09-0367 (D.N.J.)
(continuing order of civil contempt for violation of injunction
against filing of false and threatening financial documents
against persons involved in federal criminal proceeding).  And
this Court expresses no opinion as to the availability to
defendants of other civil or criminal remedies.  See, e.g., U.S.
v. Orrego, 2004 WL 1447954 (E.D.N.Y. 2004).

Here, however, this litigation is closed and the request to
re-open will be denied.  This dismissal constitutes Petitioner's
third "strike" pursuant to 28 U.S.C. § 1915(g).  See Jordan v.
Yarbrough, Civil No. 10-0177 (M.D. Tn. Feb. 23, 2010); Jordan v.
Flanagan, Civil No. 07-0137 (M.D. Tn. Feb. 2, 2007).
Accordingly, Plaintiff's ability to file further federal civil
actions in forma pauperis is already significantly constrained.

In addition, based upon the blatantly frivolous and harrassing nature of the claims asserted here, this Court finds, pursuant to 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith.

IV.   CONCLUSION

For the reasons set forth above, Plaintiff's request to re-open this action and file a second amended complaint will be denied.  The proposed second amended complaint would not survive a motion to dismiss.  All other pending motions will be denied. An appropriate order follows.

Anne E. Thompson
United States District Judge

Dated:

3/8/10

30