NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Brucestan T. JORDAN,

        Plaintiff,

v.

Clint P. GILES, et al.,

        Defendants.

Civ. No. 08-cv-6088

OPINION

THOMPSON, U.S.D.J.

    This matter appears before the Court on Defendants' motion for summary judgment. (Doc. No. 118). The Court has decided the motion based upon the written submissions of the parties and without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons set forth below, the motion is granted in part and denied in part.

BACKGROUND

    *Pro se* Plaintiff Brucestan Jordan instituted the present action against Defendant Officer Giles and Defendant Officer Nortesano (hereinafter, "Defendants"), alleging "unreasonable search and use of excessive force." Doc. No. 87 at 2. The incident at issue occurred after Plaintiff's relatives visited him in prison. Doc. No. 87 at 3. The visit was labeled as a "contact" visit; however, Plaintiff was separated from his visitors by a barrier on the table, prison officials actively prevented any physical contact between Plaintiff and visitors, and Plaintiff was told that "all visits [are] non-contact." *See* Deposition Transcript of Plaintiff ("Plaintiff's Depo.") at T106:10-107:5; *see Jordan v. Cicchi*, 428 F. App'x 195, 199 (3d Cir. 2011).

Immediately following the visit, Defendant Giles "ordered" Plaintiff to take off his clothes and attempted to perform a strip search of Plaintiff's person. Doc. No. 87 at 2; Plaintiff's Depo. at T 118:1-7. Plaintiff refused the strip search, claiming that the correctional officer "didn't have probable cause to search" because Plaintiff could not come into contact with any visitors. Doc. No. 87 at 3; Plaintiff's Depo. at T 107:7-11. When Plaintiff refused to be searched, Defendant Giles called over Defendant Nortesano and Sergeant Deverin[1] who moved Plaintiff to another room for a strip search. *Id.*; Plaintiff's Depo. at T 123:15-124:18.

After removing Plaintiff to another room, Defendant Nortesano allegedly removed Plaintiff's clothes in a "r[ough] sexual manner." Doc. No. 87 at 4.[2] Plaintiff alleges that Defendant Nortesano then ordered Plaintiff to engage in sexual acts; however, Defendants argue that these acts were simply part of the strip search which required that Plaintiff assume a compromised position. When Plaintiff refused, Defendant Nortesano and another officer "kicked" Plaintiff's knees, knocking him to the ground. Doc. No. 87 at 4. After knocking Plaintiff to the ground, Defendant Nortesano and another officer "vigorously stomped" on Plaintiff and proceeded to make "sexual comments" toward him. Doc. No. 87 at 4.

## DISCUSSION

1. <u>Legal Standard</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law [. . .]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" if it

---

[1] Plaintiff appears uncertain as to how many other officers were in the room at the time of the search; however, he has identified Nortesano and Deverin. (*See* Plaintiff's Depo. T123:15-124:18).

[2] Plaintiff stated that Officer Giles did not follow them into this room. (Doc. No. 118 at 30); (Plaintiff's Depo. T136:17-24).

could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir. 1983). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed.R.Civ.P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 250 (quoting Fed.R.Civ.P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record;" mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatte v. N.J. State Police,* 71 F.3d 480, 484 (3d Cir. 1995); *Jackson v. Danberg,* 594 F.3d 210, 227 (3d Cir. 2010) (citations omitted) ("[S]peculation and conjecture may not defeat summary judgment.").

2. Analysis

The Court will first address the claims of an unreasonable search before turning to the claims of excessive force and Defendants' qualified immunity argument.

   i.   *Search*

Plaintiff contends that the strip search violated his constitutional rights because the officials did not have sufficient cause to search him after a visit in which he did not and could not physically touch a visitor. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.

3

"Reasonableness under the Fourth Amendment is a flexible standard,[] not capable of precise definition or mechanical application." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 621 F.3d 296, 301 (3d Cir. 2010) (citations and quotations omitted). "In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id*.

In making this balancing determination, the Court must take into account the unique character of prison. Detention in a correctional facility "carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer,* 468 U.S. 517, 524 (1984) (restrictions are "necessary, as a practical matter, to accommodate a myriad of institutional needs and objectives of prison facilities, chief among which is internal security"). Therefore, the protections of the Fourth Amendment are, to some extent, less robust in prison. Furthermore, the need for the search is more pronounced in the prison context. "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 559. These risks of smuggling are greatly increased when inmates can physically contact the visitors who live on the outside. *See, e.g.*, *Florence*, 621 F.3d at 301. Due to the unique nature of prisons and the separation of powers issues implicated by judicial oversight of these facilities, courts have also recognized that prison officials deserve "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547.

While there are significant justifications for performing searches in prison and granting deference to an official's determination that a search is appropriate, the Fourth Amendment inquiry does not end here. The Court must also balance the justifications for searching against

the degree to which the search violates personal rights.  The infringement here is substantial.  *See Bell*, 441 U.S. at 576-77 (Marshall, J. dissenting) ("body-cavity searches of [] inmates represent one of the most grievous offenses against personal dignity and common decency").  The inmate is required to assume a uniquely humiliating and comprising position in front of the inspecting officer.  *Bell*, 441 U.S. at 599 ("If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected.").  There are few search procedures which impose a greater level of humiliation or a more severe affront to a person's privacy and dignity.

      Courts have held that there are some circumstances in which the balance tips toward allowing strip searches on less than probable cause.  *See Bell*, 441 U.S. at 560 (visual body-cavity inspections can be conducted after contact visits "on less than probable cause");[3] *Florence*, 621 F.3d at 308 (a policy of strip searching all incoming inmates was not unreasonable).  Defendants seemingly contend that these rulings allow officials to strip search absent individualized suspicion or probable cause after any interaction labeled a "contact visit."  Based on this interpretation of precedent, Defendants argue that the fact that they have labeled this type of interaction a "contact" visit is dispositive of the issue, even if no contact could have occurred.  *See* Doc. No. 118 at 8 (citing the Middlesex County Department of Adult Corrections Center Inmate Guidelines definition of contact visit as any visit when both individuals are "in the same room on opposite sides of a table").  The Court disagrees with this interpretation of precedent.

---

[3] The Court's decision with respect to cavity searches in this case was quite limited. *See Bell*, 441 U.S. at 560 ("we deal here with the question whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause").

Courts have been willing to defer to prison officials when they perform searches after contact or possible contact because courts are "ill-equipped to deal with" the security dangers in prisons that might stem from contact with the outside world. *Bell*, 441 U.S. at 531. These opinions have not, however, given officials *carte blanche* to label a visit in which there is no possibility of contact as "contact" and search pursuant to this title. *See, e.g.*, *Hudson v. Palmer*, 468 U.S. at 523 ("prisoners are not beyond the reach of the Constitution").[4] Therefore, the Court must examine whether, taking the facts in the light most favorable to Plaintiff, this visit is "contact" visit.[5]

The relevant distinction between a non-contact visit and a contact visit is the strict separation that assures that no contact is possible.[6] If no contact is possible, then the justification for a strip search evaporates. Here, Plaintiff has set forth facts upon which a reasonable jury could find that no contact was possible. Plaintiff and the visitors were in the same room, sitting at a table with a barrier divide. Plaintiff's Depo. at 112:19-22. Plaintiff admits in his deposition that the barrier was not completely impenetrable; if Plaintiff stood and then reached up and over

---

[4] This case is also a far cry from the Third Circuit precedent cited by Defendants in which the court upheld a blanket policy of strip searching all *incoming* inmates from the "outside." *Florence*, 621 F.3d at 302. Defendants seemingly ignore the fact that *incoming* inmates have had prolonged, unmonitored contact with the outside before incarceration.

[5] Neither Party provided the Court with case law or arguments as to the precise definition of contact visits used by the courts. The textbook definition of the terms is the following: "Noncontact visiting refers to a system in which the inmate is physically separated from his or her visitors by a barrier." 3 Rights of Prisoners § 13:15 (4th ed.). "Contact visiting, by contrast, is a visiting method in which the inmates are not totally separated from each other by a barrier but, instead, can visit directly." *Id.* "While contact visiting schemes differ, most permit the persons visiting to at least '"briefly touch, embrace and/or kiss one another."'" *Id.*

[6] The Third Circuit has suggested that a strip or cavity search would be unreasonable after a visit in which no contact was possible. *Jordan*, 428 F. App'x at 199 (reversing dismissal on the grounds that "corrections officers instructed [Plaintiff] and his family at the beginning of the visit that no contact would be allowed, and [Plaintiff] and his family sat at a table equipped with a barrier to prevent any contact").

the "barrier," he could make contact with his visitor. *Id.* However, the short wall on the table was not the only barrier. Prison officials acted as another barrier, providing a guarantee against contact. The record is replete with evidence upon which a reasonable jury could find that prison officials and prison policies effectively occupied the same role as a glass partition or other physical divide, preventing any sort of contact. *See* Doc. No. 118 at 8. Signs posted in the visiting room warn all parties in no uncertain terms that "no touching is allowed," corrections officers told Plaintiff that he could not come into contact with his visitors and told visitors they could not come into contact with Plaintiff, and officials constantly watched Plaintiff. Though neither Plaintiff nor his visitors were physically restrained or prevented from standing and making contact after standing, both Plaintiff and visitors were nonetheless prevented from standing and being in a position to make contact due to the physical partition on the table and the barrier erected by the prison's stringent policies against contact.[7]

Defendants make the paradoxical claim that this visit was a contact visit with a potential for contact and smuggling even though Inmate Guidelines clearly state that "all visits [are] non-contact" and demand that there will be "no hand shaking, hugging, or kissing at any time." *See* Doc. No. 118 at 8. However, Defendants fail to show that no reasonable jury could find in Plaintiff's favor with respect to the possibility of contact. Summary judgment with respect to the search is denied.

    ii.   *Excessive Force*

When examining an excessive force claim, the central question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause

---

[7] This determination is not meant to punish or criticize the monitoring efforts made here. However, if the monitoring and prevention is so effective or strict that an inmate has absolutely no opportunity to make contact, (which he only could have made by standing in this case), then prison officials lack sufficient justification to engage in such a degrading tactic.

harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  A Court should not grant summary judgment if "it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain."  *Whitley*, 475 U.S. 312, 322 (1986).

"In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response."  *Brooks*, 204 F.3d at 106 (citations omitted).

Here, Plaintiff has testified that Defendant Nortesano kicked him and stomped on his back after he allegedly refused to follow instructions.  Defendants contest this claim.  Therefore, there are issues of material fact as to the type and degree of force used as well as the need for force.  However, Defendant Giles was not present or involved in the actual strip search where the excessive force may have been used.  Plaintiff's Depo. at T 136:17-24.  There is also no competent evidence showing the Defendant Giles ordered or was aware of any of the events that occurred in the room.  Therefore, summary judgment is denied with respect to Defendant Nortesano's alleged force and granted with respect to Defendant Giles.

    iii.    *Qualified Immunity*

Qualified immunity is intended to shield government officials performing discretionary functions "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  A defendant has the burden to establish that he

is entitled to qualified immunity. *See Beers–Capitol v. Whetzel,* 256 F.3d 120, 142 n. 15 (3d Cir. 2001).

A ruling on qualified immunity must be undertaken using a two-step inquiry. *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). First, the court must consider whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. *See id.* at 201. "If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." *Bennett v. Murphy,* 274 F.3d 133, 136 (3d Cir. 2002).

If, however, "a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." *Saucier,* 533 U.S. at 201. "The relevant dispositive inquiry" in making this determination is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. "If it would not have been clear to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004).

With regard to the search absent sufficient justification, Defendants are entitled to qualified immunity. There is sufficient uncertainty with respect to the difference between a contact visit, after which Defendants could have searched in this way, and a non-contact visit that it would not have been clear to a reasonable officer what the law required under the facts alleged. However, taking the facts in the light most favorable to Plaintiff with regard to the excessive force claim, it is clear that a reasonable officer would know that the kicking and beating of the kind alleged here were unlawful. *See Anderson v. Creighton*, 483 U.S. 635

9

(1987); *Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005).  Accordingly, summary judgment is denied with respect to those actions.

## CONCLUSION

For the reasons set forth above, summary judgment is granted in part and denied in part.

*Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.